OPINION
{¶ 1} This is an appeal by defendant-appellant, Ohio Board of Speech-Language Pathology and Audiology ("Board"), from a judgment of the Ohio Court of Claims, awarding plaintiff-appellee, Judith D. Raabe, under a theory of promissory estoppel, the sum of $42,936.60 for raises and back pay purportedly promised to her by the Board between 1987 and 1992.
 {¶ 2} Appellee initially filed suit against the Board on September 19, 2001, but voluntarily dismissed that action and refiled the present action on April 25, 2003. The Court of Claims decided the matter based upon stipulations of fact, joint exhibits, and appellee's deposition testimony submitted to the court on February 2, 2004.
 {¶ 3} The following facts are drawn from the stipulations entered by the parties in the Court of Claims. Pursuant to R.C. Chapter 4754, the Board was created to regulate speech-language and audiology practices. All speech-language pathologists and audiologists practicing in Ohio are licensed through the Board, and the Board also investigates complaints and handles the discipline of these practitioners. The Board has eight members, appointed by the Governor with the Senate's consent, comprised of three speech-language pathologists, three audiologists, and two public members.
 {¶ 4} R.C. 4753.04 provides that the Board is to employ an executive director, and the Board stipulates his or her job responsibilities and establishes compensation. The executive director is in the unclassified civil service, serving at the pleasure of the Board. Appellee was the Board's executive director from July 23, 1984 through May 31, 2001.
 {¶ 5} As executive director, appellee was also the chief administrative and fiscal officer of the Board, and her duties included managing the Board's licensing functions, supervising investigations, preparing biennial budget requests, and handling day-to-day finance management pursuant to Ohio Adm. Code 4753-1-05(C). The executive director also assists in the preparation of the budget and monitoring all fiscal matters, including working with those government agencies that are responsible for funding the Board.
 {¶ 6} As with many state agencies, the Board's ability to spend public funds is controlled by applicable provisions of the Ohio Constitution, the Ohio Revised Code, and the Ohio Administrative Code. Further, the Ohio General Assembly appropriates funds to the various state agencies, including the Board, for their operations. Appropriations are for a biennium but are divided between the two fiscal years so that there is a defined 12-month period during which an appropriation may be used.
 {¶ 7} The Board proposes a budget to the Office of Budget and Management (OBM) prior to each fiscal biennium. An OBM analyst and the OBM director make recommendations to the Governor regarding the budget requests from the Board. The Governor then decides on each budget request and submits a final version to the General Assembly. The Legislative Budget Office reviews the submitted budget, and House of Representative subcommittees then conduct hearings to make further revisions. After all revisions have been made, the House passes the budget and sends it to the Senate, where Senate subcommittees hold hearings to review the budget; once complete, the Senate enacts the final budget and the Governor signs it, subject to any vetoes. Appropriations are made according to the final budget that was enacted.
 {¶ 8} During the relevant times herein (July 1, 1987 until July 1, 1992), the Board's appropriations came wholly from the General Revenue Fund. The funding source of the General Revenue Fund is primarily from tax dollars.
 {¶ 9} The Board's appropriations from the General Revenue Fund were divided into three sub-accounts, designated by the following numbers: 100 — Personal Services, which funds personnel costs, payroll and fringe benefits; 200 — Maintenance, which encompasses all expenditure objects, except for personal services and equipment; and 300 — Equipment, which funds items such as copiers, computers and furniture.
 {¶ 10} Beginning July 1, 1993, the Board, along with most other professional licensing boards, began receiving its appropriations from the Occupational Licensing and Regulatory Board Fund, known as the 4K9 fund. The 4K9 fund is comprised of professional licensing fees received by occupational licensing boards pursuant to R.C. 4743.05. While this fund has allowed these boards to be self-supporting, in that their licensing fees are deposited into this fund, the licensing boards' use of the monies in the fund are limited by their approved budgets and the appropriations granted by the General Assembly.
 {¶ 11} As executive director of the Board, appellee was at all times classified as administrative staff; such classification did not allow her to automatically receive pay raises, step increases, or longevity increases typically enjoyed by other state employees.
 {¶ 12} In October of 1986, the Board voted to give appellee a raise in order to make her salary "at a level commensurate with that of the same base, step and longevity of a Board/Commission Secretary II with equal service." However, due to insufficient funds in the Board's payroll account, appellee was not awarded her pay increase until July 1, 1987, when her salary increased from $16.43 to $18.83 per hour.
 {¶ 13} The Board voted appellee a six percent pay raise, effective July 1, 1988, and later voted to further increase her salary (to be effective on July 1, 1989 and July 1, 1990) in order to make her salary the "equivalent of a Board/Commission Secretary II with equal time in service." Again, however, the payroll allotments (the money appropriated to the 100 — Personal Services sub-account in the Board's budget) were insufficient to cover these raises and, thus, the increases never went into effect.
 {¶ 14} The state experienced "fiscal shortfalls" in the late 1980s, and the Governor and the Director of Budget and Management placed limitations on any "lapsing funds" at the end of fiscal year 1988. Therefore, agencies could use lapsing funds only in very limited situations, none of which included the transfer of funds from 200 or 300 accounts to the 100 account in order to grant pay increases. As a result of these limitations, the salary raises voted by the Board for appellee could not be funded from lapsing funds allotted to other accounts.
 {¶ 15} Continuing efforts by the Board to receive funding for appellee's raises included a specific request for appropriations, beginning on July 1, 1991, that would fund "(1) a raise `to bring the [executive director's] position to equivalent status of a Board/Commission Secretary II with equal longevity,' which would equal a raise of approximately $21,000 per year, and (2) an appropriation for a one-time payment of `back pay' of approximately $26,000, to cover the amounts of the raises that the Board had previously voted to give [appellee] but which were not paid due to insufficient funding." To further this effort, the Board's chairperson, Margaret Roberts, testified before both House and Senate subcommittees in the spring of 1991.
 {¶ 16} The funding for this "back pay," however, was not approved by the legislature and, therefore, never appropriated for the 1992-1993 fiscal year budget. Nevertheless, the legislature did approve sufficient funding so that the Board could increase appellee's salary to an amount equal to all of the accumulated, but unpaid, raises. Thus, effective July 1, 1992, appellee's salary was increased from $18.83 per hour to $26.89 per hour.
 {¶ 17} The Board made two more attempts in subsequent biennial budgets to gain legislative approval to pay appellee the back pay she claimed was due to her for the raises the Board had voted to provide her from July 1, 1987 to July 1, 1992, but which were not paid due to insufficient funds in the Board's 100 account. The Board first attempted to receive a one-time appropriation payment for the total amount during the 1994-1995 fiscal year. The Board again presented hearing testimony before the House and Senate budget committees during the spring of 1993. However, the Governor did not recommend the appropriation, and it was not approved by the General Assembly.
 {¶ 18} The Board made a final attempt to gain the funds needed to obtain back pay for appellee when Guy Naples, the budget chair of the Board, testified at the House and Senate budget hearings. Further correspondence took place between Board members and House and Senate members to explain their request for the appropriation, but the General Assembly denied this request for back pay.
 {¶ 19} Beginning in 1995, and subsequent to Naples' testimony before the House and Senate subcommittees, appellee had discussions with three individual members of the Board, Naples, Frank Weldele and Don Coen, regarding possible resolutions that would allow her to receive the back pay. One discussion involved a scenario in which appellee would retire and then be rehired by the Board at a higher rate of pay, thus allowing her to draw her full pension from the Public Employee Retirement System, while still being paid for working. These discussions were informal, taking place in such locations as the coffee shop in the basement of the Riffe Tower.
 {¶ 20} The option of appellee retiring and being rehired was never discussed at any formal public meeting of the Board, and the Board never considered or adopted a motion agreeing that appellee would be rehired upon her retirement. Furthermore, the full Board never discussed in any formal public meeting any other proposal under which appellee would be paid back pay upon her retirement, and the Board never considered or adopted any motion agreeing that appellee would receive the back pay in a lump sum or any other manner upon her retirement.
 {¶ 21} By memorandum dated May 9, 2001, appellee submitted her resignation and retirement to the Board. Due to her accumulation of compensatory time, appellee's last day of work was on May 11, 2001. At the time of her retirement, appellee did not ask the Board to rehire her, or to otherwise adopt any motions to effectuate the retirement/rehiring plan that had been discussed in the past with Weldele, Naples and Coen.
 {¶ 22} The Board accepted appellee's resignation at its meeting on May 23, 2001. No motions were discussed or adopted by the Board at that meeting (or any other meeting) concerning the payment of back pay to appellee upon her retirement. During her tenure as executive director of the Board, appellee never applied for any other jobs, and no one ever approached her about any other positions. Finally, the parties stipulated that, in the event appellee prevailed in this action, the amount of back pay due was $42,936.60.
 {¶ 23} In addressing appellee's claims, the Court of Claims held that the Board did not breach a specific contract with appellee; however, the court held that the doctrine of promissory estoppel was applicable. More specifically, the court held that the Board's actions of formally recommending and approving salary increases constituted a promise to pay appellee the approved amounts, and that it was reasonable for appellee to have relied upon the Board's promises.
 {¶ 24} The Court of Claims also rejected the Board's contention that appellee's claims were barred by the statute of limitations. The court found that the Board made efforts as late as 1995 to pay appellee the back pay, and that appellee had ongoing discussions with Board member Don Coen as late as the summer of 2000 to resolve the back pay issue. Further, the court found that the promises upon which appellee relied in continuing her employment with the Board contemplated post-retirement compensation for back pay, leading the court to conclude that the statute of limitations began to run as of the date of appellee's retirement, thus making her claim timely.
 {¶ 25} On appeal, the Board sets forth the following three assignments of error for review:
1. The Court of Claims erred in finding that the attempts by the speech-language pathology and audiology board to give raises to its executive director, Ms. Raabe, amounted to binding promises that were enforceable by the doctrine of promissory estoppel.
2. The Court of Claims erred in finding that Ms. Raabe's causes of action were not barred by the two-year statute of limitations set forth in [R.C.] 2743.16(a).
3. Even if binding promises were made by the Board to pay the "back pay" to Ms. Raabe, and even if her cause of action was not barred by the two-year statute of limitations, Ms. Raabe's purported reliance on those promises was not reasonable.
 {¶ 26} Appellee has filed a cross-appeal, setting forth the following two cross-assignments of error for review:
1. The Trial Court erred when it ruled that the Defendant/Cross-Appellee did not breach its contract.
2. The Trial Court erred when it denied the motion for pre-judgment interest.
 {¶ 27} The Board's first and third assignments of error are interrelated and will be considered together. Under these assignments of error, the Board generally contends that the Court of Claims erred in holding that appellee was entitled to recover under a theory of promissory estoppel. We agree.
 {¶ 28} The elements necessary to show promissory estoppel are: "(1) a clear, unambiguous promise; (2) reasonable and foreseeable reliance upon the promise by the person to whom the promise is made; and (3) resulting injury to the party who relied on the promise." Lemmo v. House of LaroseCleveland, Inc., Cuyahoga App. No. 82182, 2003-Ohio-4346, at ¶ 20.
 {¶ 29} This court has previously observed that "[a]s a general rule, promissory estoppel does not apply against the state, its agencies, arms and agents." Ohio Assoc. of Pub. School Emp. v. State Emp. RetirementSys., Franklin App. No. 04AP-136, 2004-Ohio-7101, at ¶ 48. The basis for this rule is that "[a] properly functioning government cannot tolerate individual state actors binding the state to actions that exceed or contravene its authority." Id., at ¶ 49. In Ohio Assoc. of Pub. SchoolEmp., this court noted that we have "consistently echoed the rationale for the general rule" and "refused to apply promissory estoppel to contravene statutory authority." Id. We further recognized, however, that "some Ohio courts have applied promissory estoppel when the alleged promise of the state representative or agent was consistent with statutory authority," those courts reasoning that "the general rule forbidding estoppel from being asserted against the state is absent when the application of estoppel would lead to compliance with the law rather than contrary to it." Id., at ¶ 50.
 {¶ 30} In the present case, although R.C. 4753.04 gives the Board authority to hire and fix the salary of the executive director, this authority is limited by Section 22, Article II, of the Ohio Constitution, which provides that "[n]o money shall be drawn from the treasury, except in pursuance of a specific appropriation, made by law; and no appropriation shall be made for a longer period than two years." As noted under the stipulated facts, the source of the Board's appropriations is the state's General Revenue Fund. The Ohio Supreme Court has held that "[t]he basis of expenditures from the General Revenue Fund is prior appropriation without which the auditor cannot draw a warrant on state funds." State ex rel. Rothbacher v. Herbert (1964), 176 Ohio St. 167,169-170.
 {¶ 31} R.C. 131.33 also sets forth specific provisions with respect to the expenditure of funds by state agencies, and states as follows:
No state agency shall incur an obligation which exceeds the agency's current appropriation authority. Unexpended balances of appropriations shall, at the close of the period for which the appropriations are made, revert to the funds from which the appropriations were made, except that the director of budget and management shall transfer such unexpended balances from the first fiscal year to the second fiscal year of an agency's appropriations to the extent necessary for voided warrants to be reissued pursuant to division (C) of section 117.47 of the Revised Code.
Except as provided in this section, appropriations made to a specific fiscal year shall be expended only to pay liabilities incurred within that fiscal year.
All payrolls shall be charged to the allotments of the fiscal quarters in which the applicable payroll vouchers are certified by the director of budget and management in accordance with section 126.07 of the Revised Code. * * *
 {¶ 32} Thus, R.C. 131.33 prohibits state agencies from incurring obligations exceeding its current appropriation authority, and appropriations made for a specific fiscal year may be expended only to pay liabilities incurred within that year; further, payrolls are to be paid from the quarterly allotments in which they are incurred.
 {¶ 33} As noted, appellee cites the Board's general statutory authority, under R.C. 4753.04, to fix the salary of the executive director. Despite such authority, however, the Board was limited to expending money specifically appropriated to it by the General Assembly. Such appropriations are set forth in line-item designations, including, for purposes of the instant case, funds appropriated for accounts numbered 100 (Personal Services, including payroll), 200 (Maintenance) and 300 (Equipment), respectively. The record is undisputed that, despite numerous requests by the Board, the General Assembly never approved a specific appropriation to fund appellee's back pay.
 {¶ 34} Appellee maintains, nevertheless, that existing funds were available to cover the back pay request, although she acknowledges there were insufficient funds in the 100 — Personal Services account. While there exists statutory authority for the Director of Budget and Management (as well as the State Controlling Board) to transfer an appropriation under certain circumstances, appellee does not point to any authority allowing the Board, in its own discretion, to transfer line-item appropriations from one designated account to another. Here, although the Board acted within its delegated authority in voting on issues of pay raise and back pay, the Board was limited to the expenditure of monies specifically appropriated to the Personal Services account, and any potential to transfer monies between accounts was dependent upon further action beyond its control. As noted under the stipulated facts, due to fiscal shortages in the 1980s, the Governor and Director of Budget and Management placed limitations on any lapsing funds whereby agencies could use such funds only in limited situations, none of which included the transfer of funds from the 200 or 300 accounts to the 100 account to grant pay increases.
 {¶ 35} Thus, appellee failed to demonstrate that the Board had authority to enter into a contract to award back pay unless approved by the General Assembly and made part of the appropriation, and appellee's contention that the Board had unfettered discretion to transfer funds from other accounts into the 100 account to fund a claim for back pay lacks merit. In the absence of authority for the Board to pay appellee more money than had been appropriated to it for payroll purposes, we conclude, under the facts of this case, that the doctrine of promissory estoppel is not applicable against the state. See West v. Bentleyville
(1987), 42 Ohio App.3d 95, 96 ("since any `representations' were made without the authority to act, there can be no promissory estoppel").
 {¶ 36} Although we need not reach this issue, we also agree with the Board that appellee cannot demonstrate that her reliance on promises by individual Board members to obtain the back pay was reasonable. Appellee points to informal discussions with three Board members (Naples, Weldele and Coen) to support her claim that oral promises were made to resolve the back pay issue.
 {¶ 37} Under Ohio law, the state cannot be estopped by acts of its agents not within their actual authority, even if such acts, under similar circumstances, might be within the implied or apparent authority of the agent of a private person. Mastroianni v. Bd. of Liquor Control
(1954), 69 Ohio Law Abs. 431, reversed on other grounds,98 Ohio App. 500. Further, "Ohio law requires that `whoever relies on the conduct of public authorities must take notice of the limits of their power.'" Nealon v. Cleveland (2000), 140 Ohio App.3d 101, 109, quotingCooney v. Independence (Nov. 23, 1994), Cuyahoga App. No. 66509.
 {¶ 38} In the instant case, appellee, as executive director of the Board, was charged with ascertaining that an individual member of the Board could not, acting unilaterally, have bound the Board absent approval by a majority vote of the Board at a formal public meeting. The stipulated facts show that the Board never took any formal action based upon the informal discussions appellee had with individual Board members. Moreover, even if appellee believed that individual Board members possessed such authority, her belief was unreasonable and she relied upon those representations at her own peril. Nealon, supra.
 {¶ 39} Based upon the foregoing, the Board's first and third assignments of error are sustained.
 {¶ 40} In light of our determination that the Board's authority to enter into a contract was limited by the amount of money appropriated, appellee's contention that the Court of Claims erred in failing to find that the Board breached an enforceable contract is without merit, and her first cross-assignment of error is overruled. Finally, based upon our disposition of the Board's first and third assignments of error, the Board's second assignment of error, asserting that appellee's claims are barred under the statute of limitations, as well as appellee's second cross-assignment of error, in which she contends the Court of Claims erred in failing to award pre-judgment interest, are both rendered moot and, therefore, need not be addressed.
 {¶ 41} Based upon the foregoing, the Board's first and third assignments of error are sustained, the Board's second assignment of error is rendered moot, appellee's first cross-assignment of error is overruled, and her second cross-assignment of error is rendered moot. Accordingly, the judgment of the Ohio Court of Claims is affirmed in part and reversed in part, and this matter is remanded to that court for further proceedings in accordance with law, consistent with this opinion.
Judgment affirmed in part and reversed in part, cause remanded.
Lazarus and French, JJ., concur.